**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| RED ROCK ANALYTICS LLC,<br><br>    Plaintiff,<br><br><br>  v.<br><br><br>APPLE INC., QUALCOMM<br><br>INCORPORATED<br><br>    Defendants. | Case No. 6:21-cv-00346-ADA<br><br><br>**JURY TRIAL DEMANDED**<br>**FILED UNDER SEAL** |

**DEFENDANTS QUALCOMM INCORPORATED AND APPLE INC.'S**
**SEALED REPLY IN SUPPORT OF THEIR MOTION TO**
<u>**TRANSFER VENUE TO THE NORTHERN DISTRICT OF CALIFORNIA**</u>

i

# TABLE OF CONTENTS

I.    The Court Should Give No Weight to RRA's Experts ......................................................2

II.   The Private Interest Factors Favor Transfer ................................................................8

    A.    The Convenience Of Willing Witnesses Strongly Favors Transfer.......................8

        1.    RRA improperly relies on speculation to identify Texas witnesses and fails to apply the correct inquiry for identifying relevant likely witnesses ................................................................................................8

        2.    Qualcomm's Witnesses Are in NDCA and SDCA, Not Texas ................11

            a.    Qualcomm identified likely NDCA witnesses based on actual knowledge of who designed and developed the accused technology and transceivers ............................................11

            b.    The Qualcomm witnesses RRA identified are not likely to testify.................................................................................12

        3.    Apple's Witnesses Reside in NDCA, Not Texas ......................................17

        4.    NDCA Is Equally Or More Convenient Than WDTX for RRA Witnesses ................................................................................................24

        5.    RRA Fails to Account for Time Costs......................................................26

    B.    Availability of Compulsory Process Strongly Favors Transfer............................26

    C.    No Sources of Proof Are in WDTX.....................................................................32

III.  The Public Interest Factors Favor Transfer ...............................................................34

    A.    NDCA Has a Greater Local Interest in the Suit..................................................34

    B.    The Court Congestion Factor Is Neutral..............................................................35

IV.   Conclusion ...............................................................................................................37

| Exhibit | Description |
|---|---|
| A | Feb. 17, 2022 Deposition Transcript of Roy Weinstein |
| B | Nov. 22, 2021 Discovery Hearing Transcript |
| C | Sept. 14, 2018 Expert Report of R. Weinstein |
| D | Red Rock's July 1, 2021 Infringement Contentions |
| E | Feb. 10, 2022 Deposition Transcript of Ron Murias |
| F | Sept. 14, 2018 Expert Report of Christopher Jones |
| G | Exhibit 23 to the Dec. 15, 2021 Deposition of Anthony Simon (Qualcomm's Responses to Depo. Questions 1–14) |
| H | QCRRAMTT346_0000023 |
| I | Oct. 13, 2020 Announcement of Apple iPhone 12 |
| J | Sealed Order, *Red Rock Analytics, LLC v. Samsung Elecs. Co. Ltd.*, No. 2:17-cv-00101-RSP, Dkt. 282 (E.D. Tex. Apr. 17, 2019) |
| K | Feb. 25, 2022 Declaration of Mary Anna Baldino |
| L | Mar. 3, 2022 Confidential Declaration of Paul Fontaine |
| M | Feb. 24, 2022 Confidential Declaration of John Marcincavage |
| N | Feb. 23, 2022 Declaration of Anuj Dharia |
| O | Feb. 24, 2022 Declaration of Jason Durnin |
| P | Mar. 2, 2022 Declaration of Scott Foster |
| Q | Feb. 23, 2022 Declaration of Howard Konetzke III |
| R | Feb. 24, 2022 Declaration of Glen Lochte |
| S | Feb. 24, 2022 Declaration of Amy Mahan |

| T | Mar. 3, 2022 Declaration of Marcelo Ponce |
|---|---|
| U | Mar. 1, 2022 Declaration of Nida Saiyed |
| V | Feb. 25, 2022 Declaration of Paul Salas |
| W | Feb. 25, 2022 Declaration of David Standefer |
| X | Mar. 2, 2022 Declaration of Jason Wakefield |
| Y | Dec. 8, 2021 email from R. Rundio Re: Discovery dispute in Red Rock v. Apple/Qualcomm (Case No. 6:21-CV-00346) |
| Z | Intentionally omitted |
| AA | March 4, 2022 Declaration Of Ryan Lee In Support Of Defendant Qualcomm Incorporated's Reply Brief In Support Motion To Transfer Venue To The Northern District Of California |
| BB | March 3, 2022 Declaration Of Timothy Short In Support Of Reply Brief In Support Of Defendants' Motion To Transfer Venue To The Northern District Of California |
| CC | Google Flights results for flights from Fort Lauderdale, Florida to San Francisco, California on Monday, May 2, 2022, accessed on March 4, 2022 |
| DD | Google Flights results for flights from Fort Lauderdale, Florida to Waco, Texas on Monday, May 2, 2022, accessed on March 4, 2022 |
| EE | Google Maps driving time results from Austin-Bergstrom International Airport to Waco, Texas, accessed on March 4, 2022 |
| FF | Google Maps driving time results from Dallas/Fort Worth International Airport to Waco, Texas, accessed on March 4, 2022 |

| GG | Google Flights results for flights from San Diego, California to Houston, Texas on Monday, May 2, 2022, accessed on March 4, 2022 |
|----|----|
| HH | Google Maps driving time results from Houston, Texas to Waco, Texas, accessed on March 4, 2022 |
| II | Google Flights results for flights from San Diego, California to San Francisco, California on Monday, May 2, 2022, accessed on March 4, 2022 |

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abstrax, Inc. v. Hewlett-Packard Co.*, No. 2:14-CV-158-JRG, 2014 WL 5677834 (E.D. Tex. Nov. 4, 2014) ....................................................................................................25

*Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506 (6th Cir. 2014) .......................7

*Auto-Dril, Inc. v. Nat'l Oilwell Varco, L.P.*, No. 6:15-cv-00091, 2016 WL 6909479 (W.D. Tex. Jan. 28, 2016)........................................................................................37

*DataQuill, Ltd. v. Apple Inc.*, No. A-13-CA-706-SS, 2014 WL 2722201 (W.D. Tex. June 13, 2014)......................................................................................29, 30, 34, 35

*Edmonds v. Illinois Central Gulf Railroad Co.*, 910 F.2d 1284 (5th Cir. 1990) ............................5

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp.*, LLC, 879 F.3d 1332 (Fed. Cir. 2018)....................................................................................................36

*In re Apple Inc.*, 979 F.3d 1332 (Fed. Cir. 2020) ...................................................................34, 35

*In re Atlassian Corp. PLC*, No. 2021-177, 2021 WL 5292268 (Fed. Cir. Nov. 15, 2021) ........................................................................................................................8, 13

*In re DISH Network L.L.C.*, No. 2021-182, 2021 WL 4911981 (Fed. Cir. Oct. 21, 2021) ...............................................................................................................................14

*In re Genentech, Inc.*, 566 F.3d 1338 (Fed. Cir. 2009)........................................................27, 37

*In re Google Inc.*, 588 F. App'x 988 (Fed. Cir. 2014)..........................................................25, 33

*In re Google LLC,* 855 F. App'x 767 (Fed. Cir. 2021)...............................................................35

*In re Google LLC*, No. 2021-170, 2021 WL 4427899 (Fed. Cir. Sept. 27, 2021)........................25

*In re Google LLC*, No. 2021-171, 2021 WL 4592280 (Fed. Cir. Oct. 6, 2021) ...........................25

*In re Google LLC*, No. 2021-178, 2021 WL 5292267 (Fed. Cir. Nov. 15, 2021)...........................9

*In re Horseshoe Ent.*, 337 F.3d 429 (5th Cir. 2003) ...............................................................25, 33

*In re Hulu, LLC*, No. 2021-00142, 2021 WL 3278194 (Fed. Cir. Aug. 2, 2021)..................26, 27

*In re Juniper Networks, Inc.*, 14 F.4th 1313 (Fed. Cir. 2021) ..........................................27, 34, 35

*In re Netflix, Inc.*, 2022-110, 2022 WL 167470 (Fed. Cir. Jan. 19, 2022) ...............................8, 13

*In re Nintendo Co.*, 589 F.3d 1194 (Fed. Cir. 2009).......................................................................33

*In re Quest Diagnostics Inc.*, 2021 WL 5230757 (Fed. Cir. Nov. 10, 2021) ...............................24

*In re Volkswagen AG*, 371 F.3d 201 (5th Cir. 2004) ....................................................................25

*In re Volkswagen of Am., Inc.*, 545 F.3d 304 (5th Cir. 2008).........................................................1

*Johnson v. Arkema, Inc.*, 685 F.3d 452 (5th Cir. 2012)...................................................................6

*Monterey Research, LLC v. Broadcom Corp.*, No. W-21-CV-00542-ADA, 2022
    WL 526242 (W.D. Tex. Feb. 21, 2022).................................................................... *passim*

*Moore v. Ashland Chem. Inc.*, 151 F.3d 269 (5th Cir. 1998) ..........................................................6

*Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983)............................................................3

*Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383 (5th Cir. 2009) ........................................4

*Smith v. City of Bastrop*, No. 1:19-CV-1054-RP, 2021 WL 148061 (W.D. Tex.
    Jan. 15, 2021) .........................................................................................................2, 7

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011)...........................................7

*Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1999)..........................................................................3, 4

## STATUTES, RULES, AND REGULATIONS

Fed. R. Evid. 702 ...........................................................................................................................2

Fed. R. Evid. 704 .......................................................................................................................2, 7

RRA engaged in exhaustive, burdensome, and unnecessary discovery of Qualcomm and Apple for the transfer analysis, and with each additional demand uncovered more evidence confirming that most of the relevant witnesses and evidence are in NDCA and the rest are in nearby San Diego. That NDCA is home to the majority of relevant witnesses should not be a source of surprise given that Apple is headquartered in NDCA and Qualcomm's employees responsible for ███████████████████████████████████████████████████████████████████ are in NDCA.

To attempt to identify a link to Texas, RRA engaged in a narrow process recently rejected by this Court in *Monterey Research, LLC v. Broadcom Corp.*, No. W-21-CV-00542-ADA, 2022 WL 526242, at *7-8 (W.D. Tex. Feb. 21, 2022). RRA admittedly confined its search to asking "are there relevant witnesses in Texas?" rather than "where are the relevant witnesses?" *Id*. Making matters worse, RRA hired "experts" (Ron Murias and Roy Weinstein) to review LinkedIn profiles for only Texas-based employees and speculate about what those people "likely" know, where relevant evidence is "likely" stored, how many witnesses might be called at trial, or what the NDCA schedule might be. *See generally* Dkt. 73-1 and Dkt. 73-2. Weinstein confirmed that he does not know if the people whom he and Murias identified have relevant knowledge, testifying he "can't be certain" whether witnesses know how Qualcomm's accused products work. *See, e.g.,* Ex. A (Feb. 17, 2022 Dep. of R. Weinstein ("Weinstein Dep.")) at 185:8–18. RRA cites no legal authority giving weight to self-serving, speculative "expert" contentions in the transfer analysis— particularly where the "experts" have no expertise regarding either Qualcomm and Apple employees or the *Volkswagen* factors. *In re Volkswagen of Am., Inc.*, 545 F.3d 304 (5th Cir. 2008).

Further, comparing RRA's opposition arguments to the actual facts shows that RRA and its transfer "experts" are wrong. The employees whom Murias and Weinstein claim will have

relevant information (█████████████████████████████████████████

███████████████████████████████████████) work and reside outside of Texas,

and mostly in NDCA or elsewhere in California.

The only legitimate, credible evidence demonstrates that *no* Qualcomm and Apple

witnesses with direct relevant knowledge are located in WDTX or elsewhere in Texas, no other

relevant Qualcomm and Apple evidence is located in Texas, and none of the Texas-based

Qualcomm and Apple departments and individuals identified by RRA are relevant, likely

witnesses. RRA's arguments and speculation are contrary to multiple sworn declarations from

witnesses with direct knowledge, three 30(b)(6) witnesses' testimony, and Defendants'

interrogatory responses that confirm the relevant witnesses and evidence are in California—

especially NDCA. For these reasons and those set forth in Defendants' opening brief, the

convenience of witnesses, compulsory process, ease of access to proof, and local interest factors

all weigh heavily in favor of transfer and the remaining factors are neutral.

## I.    THE COURT SHOULD GIVE NO WEIGHT TO RRA'S EXPERTS

There are four reasons that the Court should give no weight to (and otherwise exclude) the

declarations of Weinstein and Murias under Federal Rules of Evidence 702 and 704.

***First,*** as a threshold issue, the entirety of Weinstein's and Murias's declarations should be

disregarded for purposes of transfer because both are unqualified. They are not qualified to opine

on the *Volkswagen* factors because they are not lawyers. *See Smith v. City of Bastrop*, No. 1:19-

CV-1054-RP, 2021 WL 148061, at *6 (W.D. Tex. Jan. 15, 2021) (striking an expert report for

"legal opinion on how the law should be interpreted and applied in this case, which are questions

for the Court"). And they are not qualified to opine on whether an individual has relevant

knowledge because they are not experts in evaluating LinkedIn pages and publications to divine

the scope of a person's knowledge and job responsibilities (to the extent anyone could be such an

expert).  "[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Owen v. Kerr-McGee Corp*., 698 F.2d 236, 240 (5th Cir. 1983).

Weinstein is an economist and a statistician. *See* Dkt. 73-2 ¶ 5; Weinstein Dep. at 17:22-18:4, 191:3-9. Weinstein has no expertise in engineering, manufacturing, or financial database management for Apple or Qualcomm. Weinstein Dep. at 28:20-22, 188:9-16. He also has no knowledge regarding how the departments, groups, and teams are organized at Qualcomm, let alone what they know and do. *Id*. at 30:4-31:18. He does not have any expertise █████████████ ███████████████████████████████████████████████████████████. *Id*. 36:17-37:24. As such, he has no basis to provide "expert opinion" regarding how the Defendants create and maintain technical and financial data. Moreover, Weinstein has no legal expertise—he has never been a judge, an attorney, or a paralegal. *Id*. at 18:5–12, 24:9–13. In hundreds of cases, Weinstein has never opined on the *Volkswagen* factors. *Id.* at 20:1-22, 24:4-8, 25:8-11, 27:8-6, 28:4-16. Weinstein also has no specialized expertise on the cost of attendance for witnesses. Therefore, Weinstein lacks any specialized "knowledge, skill, experience, training, or education" that would qualify him to opine on any of the *Volkswagen* factors. *See Wilson v. Woods*, 163 F.3d 935, 937-38 (5th Cir. 1999) (excluding expert whose experience and professional training "was no greater than that of any other individual with a general scientific background").

Similarly, Murias only opines about what Defendants' and third parties' employees ***might*** know and what documentation they ***might*** have, but he has also no specialized "knowledge, skill, experience, training, or education" that would qualify him to opine on the particular duties, communications, strategic decisions, and organization structure within Qualcomm, Apple, and

█████████ *See* Murias Dep. at 139:15–140:13, 201:13–20. Therefore, Murias is unqualified to opine on the likely sources of proof and the likely relevant witnesses. *Wilson*, 163 F.3d at 938.

**Second,** Weinstein's and Murias's declarations are not based on sufficient facts and data. Paragraphs 43-45, 51-52, 56-79, 81-84, and 92 of Weinstein's declaration and paragraphs 30-86 and 89-138 of Murias's declaration regarding likely witnesses and the location of evidence should be disregarded because they are contrary to unrebutted record evidence. *See Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388-89 (5th Cir. 2009) (affirming exclusion of expert opinion that relied on false assumptions rebutted by undisputed record evidence). For example, Murias opined that ████████████████████████████████████████ ████████ employees "are likely to have relevant information about the accused products." Dkt. 73-1 ¶¶ 31, 36–38, 42–43. But in reaching this conclusion Murias ignores that the claims have nothing to do ██████████████████████████████████████████████ (Dkt. 74-9 at 17–18; Murias Dep. at 115:16–23, 117:17–118:9, and 129:15–21) and further requires Murias to invent claims about Qualcomm coordinating with ██████████████████████████████████ ████████████████████████████ Murias Dep. at 122:15–123:1, 123:20–126:11, 128:12–23; *see also* Section II.B, *infra*.

Both experts identify Qualcomm and Apple employees who are confirmed—via sworn declaration and deposition testimony from those with personal knowledge or who spoke to those with personal knowledge—to have no knowledge relevant to the accused technology in this case. *Compare, e.g.,* Dkt. 74-13 ¶¶ 8-12, 19, Ex. A; Dkt. 73-10 at 10:16–21, 29:14–21 (██████ Dep.) *with* Dkt. 73-2 ¶¶ 73–75, Weinstein Dep. at 71:18–74:7, 185:19-187:2 (speculating ███████████ relevant in declaration despite disregarding contrary evidence); Dkt. 74-13 ¶¶ 8-12 (Second Simon Decl.), Ex. A; Dkt. 73-9 at 18:12–19:5, 45:13–24 (██████ Dep.) *with* Dkt.73-1 ¶¶ 115-119, Murias

Dep. at 181:6–183:11 (same for ███); Dkt. 74-13 ¶¶ 4-13, Ex. A; Dkt. 74-14 ¶¶ 8, 9 (Third Simon Decl.) *with* Dkt. 73-1 ¶¶ 126–137, Murias Dep. at 186:5–195:2 (same for ███████); Dkt. 74-13 ¶¶ 4-13, Ex. A; Dkt. 74-14 ¶¶ 8, 9 *with* Dkt. 73-1 ¶¶ 126–137, Murias Dep. at 173:12–25 (same for ██████████); Dkt.73-7 at 16:17–17:11 *with* Dkt. 73-1 ¶¶ 56–65, Murias Dep. at 227:5–232:6 (same for ██████ *see generally* Dkt. 45-15; Dkt. 45-16, Dkt. 74-12 through 74-14.

**Third,** Weinstein's and Murias's declarations are not based on reliable principles and methods.

Paragraphs 43-45, 51-52, 56-79, 81-84, and 92 of Weinstein's declaration and paragraphs 30-86 and 89-138 of Murias's declaration regarding relevance and knowledge of employees should be disregarded for the purposes of § 1404 as improper *ipse dixit*. *See Edmonds v. Illinois Central Gulf Railroad Co.*, 910 F.2d 1284, 1287 (5th Cir. 1990) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."). Both employ the same flawed approach: identify certain individuals in Texas (without any methodology for doing so) and, under the guise of some unidentified expertise, leap directly to conclusions on relevance and likely knowledge, without analyzing any contrary evidence on the record. *See, e.g.*, Dkt. 73-1, ¶¶ 74–78; Dkt. 73-2, ¶¶ 52–77. For example, Murias could not recall and otherwise refused to explain how he chose specific employees for his declaration or how he could divine information in people's heads from the LinkedIn information he considered. Murias Dep. at 84:20–92:23, 86:12–87:4. Similarly, Weinstein's "methodology" is no more than speculation based on LinkedIn profiles limited to Texas. *See* Weinstein Dep. at 49:2–50:12, 34:21–36:2.

Paragraphs 30-86 and 89-138 of Murias's declaration and paragraphs 23–28, 31–47, and 49–94 of Weinstein's declaration of should be disregarded because they result from unreliable

speculation based on "personal knowledge and experiences" alone instead of the facts of the case. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) ("'knowledge' connotes more than subjective belief or unsupported speculation").

All of Weinstein's *Volkswagen* analysis results from unreliable, personal speculation. With regard to private factor 1 (access to sources of proof), Weinstein discounts facts in favor of his personal views on the storage of evidence. *See, e.g.*, Dkt. 73-2, ¶¶ 23, 24, 38, 39. Weinstein's opinions on private factors 2 and 3 (availability of compulsory process and inconvenience to willing witnesses) impart his personal experience in unrelated trials to speculate and predict what witnesses and strategy the parties will employ in this case. *See, e.g., id*. ¶¶ 43, 45 47, 84; Weinstein Dep. at 109:4–110:18. And Weinstein's rationale for travel costs speculates extensively using his personal travel habits. *See e.g., id.* at 112:7–113:2, 116:9–20, 119:24–121:19) But despite acknowledging that "each case is different," Weinstein does not attempt to explain why his past experiences alone are sufficient, nor does he connect these experiences (and ultimate opinions) to the specific circumstances here. Opinions stemming from these personal experiences are no more than "unsupported speculation or subjective belief." *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).

Similarly, Murias—who opines on the operations and knowledge of Qualcomm, Apple, ████████ employees—speculates about the roles of individuals, teams, and offices at Qualcomm to generate a narrative that fits his conclusions. Murias Dep. at 63:12–64:12, 135:5–140:13, 149:5–150:18, 157:3–25 (speculating which employees designed particular hardware, write software code, and have knowledge of accused products).

Paragraphs 98-103 of Weinstein's declaration should be disregarded because his analysis of the hypothetical cost due to the potential delay to trial is also flawed. In particular, Weinstein

derives his hypothetical damages by using his rate from the *Samsung* litigation, without using any *Georgia Pacific* factors that reflect **this** litigation. *See, e.g.*, Weinstein Dep. at 127:25-128:12, 148:14-149:2, 155:18-22, 157:23-158:2 (not considering hypothetical negotiation in this case); 162:8-163:8 (not comparing current accused products to licenses and accused products in *Samsung* litigation). Such a rate equates to an inadmissible rule of thumb. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) ("the patentee must sufficiently [tie the expert testimony on damages] to the facts of the case" (internal quotation marks omitted, alteration original)). Weinstein compounds this error by applying an arbitrary rate of return that fails to consider any actual facts about Red Rock's investment tendencies, taxes and debts owed, and inflation. *See, e.g.*, Weinstein Dep. at 140:1-6, 142:15-143:24.

 **Fourth**, the entirety of Weinstein's and Murias's declarations should be disregarded as mere mouthpieces for attorney argument. Because the *Volkswagen* test is based on fact (and not expert) evidence, many of Weinstein's and Murias's opinions are simply attorney argument masquerading as expert opinion and should be excluded. *See Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510–11 (6th Cir. 2014) ("Where an expert merely offers his client's opinion as his own, that opinion may be excluded."). Weinstein and Murias directly assume the role of advocate. Murias uses several paragraphs to offer attorney argument to rebut statements made about Defendants' employees. *See, e.g.*, Dkt. 73-1, ¶¶ 111, 124, 125, 130, 136 (questioning language and veracity of Qualcomm's declarations). And Weinstein injects nearly all his *Volkswagen* opinions with attorney argument. *See, e.g.*, Dkt. 73-2, ¶¶ 38, 39 (arguing for the weight given to the physical location of evidence); ¶¶ 90, 92 (discounting the importance of travel costs relative to litigation costs regardless of venue); ¶¶ 104–06 (arguing the significance of

various time-to-trial differences). These opinions exceed the purview of expert testimony and should be excluded. *See Smith*, 2021 WL 148061, at *6; Fed. R. Evid. 704.

## II.    **THE PRIVATE INTEREST FACTORS FAVOR TRANSFER**

### A.    **The Convenience Of Willing Witnesses Strongly Favors Transfer**

The location of relevant witnesses supports transfer. RRA admits that its witnesses are in Florida (John Cafarella) and the San Diego area (Jeffrey Fischer), but not in Texas. Dkt. 73 at 9. As discussed below, the relevant Apple or Qualcomm witnesses are likewise not in Texas.

1.    RRA improperly relies on speculation to identify Texas witnesses and fails to apply the correct inquiry for identifying relevant likely witnesses

RRA only speculates that Texas employees could have information. Speculation is not enough. *See In re Atlassian Corp. PLC*, No. 2021-177, 2021 WL 5292268, at *3 (Fed. Cir. Nov. 15, 2021) (rejecting relevance arguments as based on conjecture and as contrary to the record); *In re Netflix, Inc.*, 2022-110, 2022 WL 167470, at *4 (Fed. Cir. Jan. 19, 2022) (identifying EDTX employees who merely "appear[] just as likely" to have information less compelling than declarations identifying NDCA employees who designed, developed, and managed accused technology and authored articles cited in complaint). RRA cannot identify anyone with direct knowledge of the accused I-Q gain calibration functionality because Defendants' extensive investigations confirm that no such witnesses are in Texas.[1] Dkt. 45-15 ¶¶ 15-22 (First Simon Decl.); Dkt. 45-16 ¶¶ 13-20 (Vijayan Decl.); Dkt. 74-13 ¶¶ 4-13, Ex. A; Dkt. 74-14 ¶¶ 7-9; Dkt. 45-17 (Decl. of M. Rollins) ¶¶ 5-10; Dkt. 73-12 (Second Decl. of M. Rollins) ¶¶ 2-6. Those

---

[1] Well before RRA's response brief, each of the Qualcomm employees who RRA and its experts attempt to claim are likely witnesses were affirmed to not have direct knowledge of the accused I-Q calibration technology for the accused products pursuant to the Court's direction. Dkt. 74-13 ¶¶ 4-13, Ex. A; Dkt. 74-14. RRA also deposed two of them (███████████████████) and sought and was received for several more (including ███████████████████████) before its brief yet RRA and its "experts" wholly discard the contrary evidence. Dkt. 74-14; Dkt. 73-9; Dkt. 73-10.

investigations also confirm that no relevant ████████████████ personnel are in Texas. Dkt. 45-15 ¶ 14; Dkt. 45-16 ¶ 12; Dkt. 74-12 ¶¶ 4-12, Ex. A; Dkt. 45-17 ¶¶ 11-16. Notably, *all* the Qualcomm employees identified by name by RRA have confirmed that they have no direct knowledge of ████████████████████████. Dkt. 74-13 ¶¶ 4-13, Ex. A; Dkt. 74-14. Apple's 30(b)(6) witness likewise confirmed ████████████████████████

████████████████████████████████████████

████████████████████████████ Dkt. 74-12 ¶¶ 4-6.

For example, for Qualcomm sales witnesses, RRA identified Tricia Dugan, Ken Noblitt, and Tom Leach based on their LinkedIn profiles and Weinstein's speculation that they might know something useful. Weinstein Dep. at 90:23–91:3; *In re Google LLC*, No. 2021-178, 2021 WL 5292267, at *2 (Fed. Cir. Nov. 15, 2021) (agreeing that online profiles were entitled to little weight). RRA and Weinstein's identification of Tom Leach as a "likely" witness underscores the unreliability of LinkedIn for this purpose. Tom Leach left Qualcomm in 2009—over a decade before the accused products were announced. Ex. JJ; *see also* Dkt. 74-13 ¶ 16. This and RRA's other erroneous conclusions make clear that RRA's and its expert's research was designed to conjure up relevant witnesses throughout Texas, as opposed to looking for evidence of who and where the relevant witnesses might be located.[2] *Monterey Research,* 2022 WL 526242, at *7.

As to technical issues, the idea that RRA will rely on *any* individual witness testimony to prove its case is belied by RRA's litigation history. In both this case and in RRA's prior case against Samsung, RRA's technical expert, Murias, analyzed infringement based solely on technical documents without considering any witness testimony. *See* Dkt. 73-1, ¶¶ 5, 19, 20, 25–

---

[2] The other Qualcomm sales people identified by RRA and its expert are also not likely witnesses, as discussed in Section II.A.2.b, *infra*.

29, and Appendix A; Murias Dep. at 37:15–39:10, 44:14–45:1, 77:2–25, 79:25–80:4, 147:19–148:8. To map the claims to the accused products in this case, Murias simply "went into the code room and found what I needed to find. It's that simple." Murias Dep. at 38:18–39:10. Similarly, RRA's testifying expert in the Samsung case (in which Qualcomm products were accused) cited testimony from only a *single* ████████ witness: ████████████████████. *See* Ex. F (Sept. 14, 2018 Expert Report of C. Jones) ¶ 399 and its Ex. A at ¶ 5. Qualcomm will offer testimony from one or more 30(b)(6) witnesses on technical issues here and, ████████████ ████████████████████████████████████████████████████ ████████, those witnesses will reside in NDCA and SDCA.

    Even assuming that RRA intends to break with its own practice and rely on fact witness testimony here, RRA has not sufficiently identified a single relevant Texas-based Qualcomm or Apple witness. From the outset, RRA applied the incorrect inquiry. Murias, for example, was asked by RRA's counsel "to look at Texas and that's what [he] did." Murias Dep. at 82:25–83:22. He did not "investigate whether there are any Qualcomm or Apple employees outside the State of Texas that would be likely sources of relevant evidence about infringement"[3] (Murias Dep. at 83:5–13; 85:22–86:11) and did not investigate whether the California-based employees identified by Qualcomm have information relevant to this case (Murias Dep. at 83:5-13, 133:23–134:7; 144:5–146:3, 175:20–176:9). Similarly, Weinstein did not seek to identify any Qualcomm or Apple witnesses in California who might have relevant information. Weinstein Dep. at 52:24–55:5. Such a gerrymandered search for witnesses violates this Court's guidance that "the opening

---

[3] Murias later testified that he "looked at people outside of Texas," but could not remember how many or what their names were. Murias Dep. at 158:13–159:22.

inquiry" for a venue investigation "should be 'where are the relevant witnesses located?'; not 'are there relevant witnesses located in [Texas]?'" *Monterey Research,* 2022 WL 526242, at *7.

        2.    <u>Qualcomm's Witnesses Are in NDCA and SDCA, Not Texas</u>

            a.    <u>Qualcomm identified likely NDCA witnesses based on actual knowledge of who designed and developed the accused technology and transceivers</u>

As already acknowledged by RRA and noted by the Court, the accused functionality in this case is "IQ calibration." Ex. B at 29:16–30:10. RRA's own damages expert described the patented technology as "teach[ing] how to calibrate for what are known as I/Q gain imbalances in wireless transceivers" in his report cited in his declaration in this case. Ex. C (Sept. 14, 2018 Expert Report of R. Weinstein) ¶ 29; Weinstein Dep. at 151:2–21. Following an extensive pre-motion investigation based on interviews of those with actual knowledge of who does what within Qualcomm (confirmed via further investigation during discovery), Qualcomm identified six people who have direct knowledge ███████████████████████████████████.[4]

Dkt. 45-15 ¶ 11; Dkt. 45-16 ¶ 9. All are in NDCA or San Diego. RRA does not dispute that the identified witnesses have direct relevant knowledge and are likely witnesses. Unlike RRA, Qualcomm identified relevant witnesses by asking "where are the relevant witnesses?" rather than "are there relevant witnesses in Texas?" *See Monterey Research,,* 2022 WL 526242, at *7.

RRA attempts to retreat from its allegations that papers and patents by six NDCA and six SDCA authors are relevant. Dkt. 73 at 11; *E.g.,* Dkt. 31-2 (First Amended Compl.) at 9, 10, 14, 15; Ex. D (Red Rock's July 1, 2021 Infringement Contentions) at 7, 8, 12, 13. But those papers and patents constitute nearly all the evidence cited in RRA's complaint and infringement

---

[4] RRA tries to ascribe meaning to Qualcomm's use of terms like "algorithms and techniques" and "responsibilities" (Dkt. 73 at 3, 12), but those terms are plainly meant to demonstrate that it investigated who at Qualcomm ██████████████████████████████████████████.

contentions, and no evidence cited in RRA's complaint or contentions has any apparent relationship to Texas-based Qualcomm employees. *Id*. Just because RRA abandons its complaint and contentions evidence does not mean that Qualcomm will not call those authors to rebut RRA's contentions.

        b.        <u>The Qualcomm witnesses RRA identified are not likely to testify</u>

For sales witnesses identified by RRA and its expert, Tom Leach undeniably has no relevant information and is not a likely witness for the reasons previously discussed in Section II.A.1, *supra*. The remaining two sales witnesses identified by RRA are also not likely witnesses. Tricia Dugan and Ken Noblitt confirmed that neither has relevant knowledge. Both affirmed that they have no knowledge of ███████████████████████████. Dkt. 74-13 ¶¶ 4-12, 19, Ex. A. In her deposition, Tricia Dugan further testified that ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████. Dkt. 73-10 at 8:24–10:24, 15:4-14, 16:7-19, 18:20-25, 21:9-22:15, 44:16-45:22; Weinstein Dep. at 58:1–19. ██████████████████████ ███████████████████████. Dkt. 74-13 ¶¶ 5–6, 19, Ex. A. Moreover, Weinstein admitted that he made no attempt to investigate the people identified by Qualcomm as relevant or conduct a similar LinkedIn search in NDCA or elsewhere (Weinstein Dep. at 52:24–53:15) and did not consider the ████████████████████████████████████. Weinstein Dep. at 81:2–84:7, 89:20–90:1 (citing Dkt. 72-10 at 21:6–24, 45:11–23, 48:3–49:22). In short, RRA and its expert searched only for people in WDTX rather than for relevant witnesses. *Monterey Research,* 2022 WL 526242, at *7.

For technical witnesses, RRA relies heavily on *unnamed* members of the ███████████ ██████████████████ in Texas as allegedly being potential witnesses. But RRA fails to inform the Court that records produced by Qualcomm indicate that at least ███ California-based employees work in those same departments and that scores more in NDCA and SDCA are also involved in the general design work relied on by RRA. Dkt. 75-19. Nor can RRA's generic speculation overcome the sworn testimony confirming that Texas employees have no direct relevant knowledge. Dkt. 45-15 ¶¶ 15-22; Dkt. 45-16 ¶¶ 13-20; Dkt. 74-13, Ex. A; Dkt. 74-14. Such speculation is entitled to less weight in the context of § 1404. *See Atlassian*, 2021 WL 5292268, at *3; *Netflix*, 2022 WL 167470, at *4. Moreover, Murias testified that, other than the seven specific Qualcomm employees discussed in his declaration, he felt "comfortable bringing . . . forward" no one else. Murias Dep. at 87:6–88:1.

RRA's theory of relevance for Qualcomm's Texas-based employees is premised on speculation that these unnamed employees ███████████████████████. Dkt. 73 at 11–12. But the '313 patent's inventor confirmed that he did not invent the hardware components that RRA identifies in its opposition papers (*e.g.*, DSPs, receive chains, amplifiers). Dkt. 73-12 at 39:1–17; 67:20–73:8. Regarding the DSP, Murias alleges that only a single element of the asserted claims is satisfied by the DSP hardware: the generic structural element "processor." Whether or not the accused products include a DSP is not a central dispute in this case. RRA's allegations focus on several claimed functions—including functions claimed simply as being performed by the "processor"—that it claims are satisfied by *software code*. Dkt. 73-1 ¶ 88 ("The DSP (when executing code) performs functions," including the "processor['s]" function of "forming an observable indicator"); Murias Dep. at 67:13–68:5 (code running on the DSP allegedly

████████████████████████████████████████████████████████████████

██████ "); *see also* Dkt. 73 at 11; Dkt. 73-4 ¶¶ 20–21. Qualcomm's declarants Anthony Simon

and Rajiv Vijayan have testified that ████████████████████████████

████████████████████████████████████████████████████

██████████ Neither RRA nor Murias rebuts that testimony. *See, e.g.,* Dkt. 45-15; Dkt. 45-16;

Dkt. 74-13; Murias Dep. at 109:9–23, 150:12–18 ██████████████████████

████

Regarding the ██████████ RRA and its expert do not identify any specific relevant

hardware designed in Texas. That is not surprising, as Qualcomm's declarants have affirmed that

████████████████████████████████████████████████. Dkt.

45-16 ¶¶ 9–11; Dkt. 45-15 ¶¶ 11–13; Dkt. 74-13; Dkt. 74-14. Murias's theory that ████████

████████████████████████████████████████████

████████████████████████████████████████████

████ )) ignores the Court's guidance that the search for relevant witnesses should "focus on the

people who . . . have direct information with regard to the accused functionality" (Ex. B at 29:16–

30:7) and that mere awareness of that functionality is insufficient (*id.* at 31:4–12). *In re DISH

Network L.L.C.*, No. 2021-182, 2021 WL 4911981, at *3 (Fed. Cir. Oct. 21, 2021) ("[E]ven if these

Texas-based operations may have some connection to the accused [products], that connection is

insubstantial compared to Colorado's significant connection to the design and development of the

accused features."). Indeed, if mere awareness of portions of ████████████████████

██████████████ were the test for identifying relevant or likely witnesses, the population of

relevant witnesses might include hundreds or even thousands of Qualcomm employees in

California alone.

14

RRA guesses that Sher Fang, Abdellatif Bellaouar, and Sherif Embabi might have information but fails to acknowledge that ████████████████████████████████ ██████. Dkt. 74-38; Dkt. 74-34; Dkt. 74-14. Other than non-specific references to RFIC design and generic RF technology in their work history and bare speculation about what these witnesses know or "would need to know" (*see, e.g.*, Dkt. 73-1 ¶ 99), RRA (through its expert declaration) builds its case for relevance on papers and patents that these employees wrote before joining Qualcomm and that have no apparent relation to any product accused in this case. Murias Dep. at 165:13–167:7 ("Sliding-IF" paper written while Bellaouar, Fang, and Embabi worked for Globalfoundries and relates to specific FDSOI technology with no known tie to case);[5] 168:22– 171:10 (patents are assigned to GlobalFoundries and Murias "didn't say either . . . describes a Qualcomm product"); and 177:20–179:8 ("Quad-Band Receiver" paper written by Fang while working for Texas Instruments, relates to old cellular standards not at issue here and specific fabrication technology with no known tie to case). Murias cites those papers as evidence that Fang and Bellaouar are "knowledgeable about the SECS2 fabrication operations" (Dkt. 73-1 ¶¶ 103, 110) but, as discussed below, there is no evidence that the specific fabrication technology discussed in those papers is ██████████, and the '313 patent has nothing to do with fabrication. For Fang, RRA specifically sought additional information about her during discovery and that additional information confirmed █████████████████████████████████. All three confirmed that ████████████████████████████████████████ ████████████████████████████████████████████████████████ Dkt. 73 Ex. 25 at 2–3; Dkt. 74-13 ¶¶ 4-12, Ex. A; Dkt. 74-14 ¶ 8a.

---

[5] Murias does not even know what "FDSOI" stands for. Murias Dep. at 167:2-7.

RRA's assertions for Teja Renukaradhya and Dinkar Piratla are also unfounded. ███████

████████████████████████████████████████████████████████████████████████

█████████. Dkt. 73-9 at 18:12–19:5; 45:13–46:7; 62:6-64:2 (Dec. 8, 2021 Dep. of D. Piratla);

Dkt. 74-14 ¶ 8e. They have no direct relevant knowledge, as the sworn declarations from Anthony

Simon confirm. Dkt. 74-14 ¶¶ 4-13, Ex. A; Dkt. 74-14 ¶¶ 8-9. The technical underpinning of RRA

and Murias' rationale regarding these employees is also flawed. Murias contends that because

Piratla and Renukaradhya sometimes ████████████████████████████████████████

████████████████████ they must work with ████████████. Dkt. 73-1 ¶¶ 115, 117–19, 122–

25; Murias Dep. at 181:6–13. But Murias admitted that ██████████████████████████

████████████████████████████████████████████████████████████████████████

(Murias Dep. at 181:14–16, 184:3–185:5), and that he has no reason to doubt Piratla's sworn

deposition testimony that ████████████████████████████████████ (*id.* at 182:1–

183:11).

The only specific █████████████████████ identified by RRA are ████████████

█████, but neither is involved in the design or development of any hardware or software at issue

and neither has knowledge of the accused I-Q gain calibration functionality. Dkt. 74-13 ¶ 13; Dkt.

74-14 ¶¶ 8c-8d; Ex. BB. Despite the sworn testimony explaining what they and their team do,

RRA and its expert simply declare that ████████████████ must have relevant knowledge and that

their job description must be different from what Qualcomm says it is. When asked to explain this

speculation, Murias hypothesized that ████████████████████████████████████████

████████████████████████████████ Murias Dep. at 185:17–187:18; *see also id.* at

134:21–143:21. ██████████████████████████████████████████████, ██████

████████████████████████████████████████████████████████████████████████



RRA and its "experts" are wrong, which is not surprising as their understanding of what Qualcomm's employees do or how products are developed at Qualcomm is based entirely on speculation and guesswork. Ex. BB ¶¶ 5-14

3.    Apple's Witnesses Reside in NDCA, Not Texas

Regarding the Apple employees, RRA admits that no Apple technical witnesses with knowledge of the accused chips work in WDTX. Dkt. 73 at 5, 8-9. Instead, all Apple witnesses

---

[6] Murias admitted that

responsible for  ███████████████████████████████████████

███████████████████████████ Dkt. 45-17 ¶¶ 8-9. As to the damages witnesses, RRA does

not deny that ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████. Dkt. 73-6 (Rollins Dep.) at 63:10-64:15, 170:20-

171:20. Nor does it deny that ████████████████████████████████████████████

███████████████████████████████████. Dkt. 45-17 ¶ 14.

Rather than dispute these facts, RRA points to three categories of other alleged Apple

witnesses. But none is remotely likely to testify, and RRA's assertions to the contrary are based

on speculation that is directly contrary to the facts.

***First***, RRA contends that that  █████████████████████████ has

knowledge of █████████████████████████████ Dkt. 73 at 9-10. But, as Apple

explained when RRA unsuccessfully sought to compel discovery on this topic, ███████████

██████████████████████████████████████████████████ Ex. B at 31:17-

33:6; Dkt. 73-6 at 114:6-115:7. █████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. Y. ███████████████

████████████████████████████████████████████████████

***Second***, RRA refers to five employees whom Murias identified as allegedly "likely"

knowing about "infringement" and "the technical value contributions of the '313 Patent." Dkt. 73-

1 ¶¶ 45-82; Dkt. 73 at 10-11. But to the extent that these employees have any knowledge about I-

Q calibration at all, it is decades old, unrelated to the 5G standard, and certainly not connected to the Qualcomm 5G chips or the accused products in this case.

As to Angelika Schneider, Fikret Dulger, Paul Fontaine, and John Marcincavage, Murias simply speculates about their "likely" knowledge based on (1) their LinkedIn profiles, and (2) patents and publications from 2003, 2006, and 2008—long before 5G even existed—on which they are one of many authors. Dkt. 73-1 ¶¶ 66-82 (citing Dkt. 75-3 (2008 patent); 75-4 (2008 paper); Dkt. 75-6 (2006 paper); Dkt. 75-7 (2003 paper)).





. *Id.* ¶ 2.

. *Id.* ¶ 3.

His contribution to the 2008 IEEE paper that Murias cited

. *Id.* ¶ 5.

The only deponent among the alleged technical witnesses Murias identifies, Seydou Ba, further confirms the unreliability of LinkedIn profiles and past papers to determine an individual's knowledge and the lengths to which RRA must stretch to identify allegedly relevant witnesses in Texas. While RRA claims that Dr. Ba has knowledge of I-Q calibration and EVM improvement techniques,

Dkt. 73-7 at 93:22-95:9, 67:19-68:2, 77:7-19.

. *Id.* at 17:1-6.

*Id.* 14:3-25.[8]

None of these employees is likely to testify regarding infringement or the value and technical contributions of the '313 patent, which (as this Court has explained) relates to I-Q calibration, because

.

---

[8]

Dkt. 73-7 at 17:22-18:6, 20:13-19, 23:12-24:14, 27:11-18, 29:7-13, 55:23-56:5, 75:17-25.

*Id.* at 89:21-90:9.

*Third*, RRA's expert, Weinstein, points to fourteen employees identified as allegedly "likely" knowing about damages topics. Dkt. 73-2 ¶¶ 56-71; Dkt. 73 at 11. But that is speculation based *only* on LinkedIn profiles, and is contradicted by the testimony of the only one of these employees RRA deposed: Kai Oeffner. ████████████████████████████████████ ██████████████████████████████████████████████████████████ Dkt. 73-8 at 7:21-9:21. ████████████████████████████████████████████████ ████████████████████████████. *Id.* at 11:10-12:12. ████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ *Id.* at 12:13-13:17.

The other thirteen individuals whom RRA identifies have similarly limited and/or irrelevant knowledge. As to those RRA says have knowledge of accused product revenues and unit sales, Dkt. 73 at 11, ████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████ Ex. P (Foster Dec.) ¶ 2. ████████████████████████ ██████████████████████████████████████████████████████████ Ex. R (Lochte Dec.) ¶ 2. ████████████████████. Ex. V (Salas Dec.) ¶ 2. ████████████ ████████████████████████████████████████ Ex. K (Baldino Dec.) ¶ 2. ██ ████████████████████████████████████████████████████████ ████████████████████ Ex. T (Ponce Dec.) ¶ 2.[9] ████████████████████████████████████████████████ ████████████████████████████████████████████████ (Ex. P (Foster)

---

[9] ████████████████████████████████████████████████████████ ██████████████████████████████. Ex. V ¶ 3.

¶ 6, Ex. R (Lochte) ¶ 4, Ex. V (Salas) ¶ 5, Ex. K (Baldino) ¶¶ 4, 6, Ex. T (Ponce) ¶ 4); 

(Ex. P (Foster) ¶¶ 3-4; Ex. R (Lochte) ¶ 4, Ex. V (Salas) ¶ 3, Ex. K (Baldino) ¶ 3, Ex. T (Ponce) ¶ 4);

(Ex. P (Foster) ¶ 5, Ex. R (Lochte) ¶ 5, Ex. V (Salas) ¶ 4, Ex. K(Baldino) ¶ 5, Ex. T (Ponce) ¶ 5). Weinstein is therefore in error that they have knowledge related to "convoyed sales," "commercial success," or the extent to which Apple has made use of the accused features.

As to those RRA says have knowledge of IP licensing policies and comparable licenses, Dkt. 73 at 11, 

Ex. X (Wakefield Dec.) ¶ 2.

. *Id.* ¶ 5.

Ex. N (Dharia Dec.) ¶¶ 2-3.

(Wakefield ¶¶ 5-7, Dharia ¶¶ 4-6). Contrary to Weinstein's assertion, neither is remotely likely to be a witness regarding relevant IP licensing policies or comparable licenses.

As to those RRA says have knowledge of accused product marketing and customer demand for accused features, Dkt. 73 at 11,

████████████████████████████████. Ex. S (Mahan Dec.) ¶ 2. ███████████

████████████████████████████████████████████████████████

██████ Ex. Q (Konetzke Dec.) ¶ 2. ████████████████████████

████████████████████████████████████████████████████████

████████ Ex. O (Durnin Dec.) ¶¶ 2-3. ██████████████████████

███████████████████████████████████████████████████████. Ex. W

(Standefer Dec.) ¶ 2.

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████ (Ex. S (Mahan) ¶ 3, Ex. Q (Konetzke) ¶ 3, Ex. O (Durnin) ¶ 5, Ex. W

(Standefer) ¶ 5), ███████████████████████████████████████ (Ex. S (Mahan

¶¶ 4-5), Ex. Q (Konetzke) ¶ 4, Ex. O (Durnin) ¶ 6, Ex. W (Standefer) ¶ 4). They are not remotely

likely to be witnesses in this case.

Finally, RRA identifies Nida Saiyed as allegedly having knowledge related to sales

forecasting. Dkt. 73 at 11. ████████████████████████████████████████

███████████████████████████████████████████████████. Ex. U (Saiyed

Dec.) ¶ 2. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*Id.* ¶¶ 2, 3, 6-7. Weinstein is therefore wrong that she has knowledge related to "convoyed sales,"

"commercial success," or the extent to which Apple has made use of the accused functionality.

Weinstein makes much of SAP being the "source of truth" for Apple's financial data (Dkt. 73-2 ¶ 27), ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ (Ex. K (Baldino) ¶ 6, Ex. O (Durnin) ¶ 7, Ex. P (Foster) ¶ 6, Ex. Q (Konetzke) ¶ 5, Ex. S (Mahan) ¶ 6, Ex. U (Saiyed) ¶ 4, Ex. V (Salas) ¶ 5, Ex. W (Standefer) ¶ 5).

All of this is consistent with Rollins's testimony that ███████████████████████ █████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 73-6 at 29:12-30:10, 167:13-169:22, 213:5-22. Even if these fourteen people RRA identifies each had a small "part of the picture needed" for a full damages analysis, Dkt. 73-2 ¶ 68, RRA cannot contend that it would be more convenient to call fourteen people from Texas for information that one person in NDCA can provide. That is the antithesis of "convenient." *See* Ex. B at 29:16-30:7 (Court acknowledging that some knowledge of iPhone sales not enough to keep case in WDTX and focus should be on those with "direct information with regard to the accused functionality.").

4.    NDCA Is Equally Or More Convenient Than WDTX for RRA Witnesses

RRA concedes that its witnesses are not in Texas, but instead are in Florida and San Diego, California. While RRA offers testimony from Cafarella and a declaration from Fischer that Texas is more convenient for them than California, those assertions are disconnected from the reality of the travel burden and should be given little weight.

Cafarella resides in a condo in Lauderdale-by-the-Sea, Florida, which is also RRA's "office." Dkt. 73-12 (Cafarella Dep.) at 8:22-9:17, 24:19-25:15. Cafarella has never been to Waco. *Id.* at 133:8-9.[10] The total travel time from Fort Lauderdale to either Waco or San Francisco is

_____

[10] He has "[p]ossibly once, but so long ago [he's] not sure" been to Austin. Dkt. 73-12 at 133:10-13.

comparable. Ex. CC (showing 6 hr 20 min nonstop flight from Fort Lauderdale to San Francisco); Ex DD (showing 3 hr flights from Fort Lauderdale to Dallas or Austin); Ex. EE (showing 1 hr 37 min driving time from Austin to Waco); Ex. FF (showing 1 hr 48 min driving time from Dallas to Waco); *In re Quest Diagnostics Inc.*, 2021 WL 5230757, at *2 (Fed. Cir. Nov. 10, 2021) (alleged convenience of Waco for witnesses in Maryland and New Jersey could not outweigh convenience of CDCA for other witnesses because lack of airport in Waco meant total travel time would not be "significantly different.")

Fisher is a consultant for RRA who lives in San Diego, California. Dkt. 73-3 ¶ 2. As an initial matter, as a consultant, Fisher's convenience should not be given similar weight to that of a party witness. *Cf. Abstrax, Inc. v. Hewlett-Packard Co.*, No. 2:14-CV-158-JRG, 2014 WL 5677834, at *5 (E.D. Tex. Nov. 4, 2014) ("[T]he Court gives little weight to the locations of the parties' expert witnesses."). Even so, Fisher contends that it would be more convenient for him to attend trial in Waco than in the NDCA because "RRA's attorneys are located in Houston, and their offices are only a few hours' drive from Waco, Texas." *Id.* ¶¶ 5-6. But to get to Houston from San Diego and then drive to Waco takes a total of six hours, whereas flying from San Diego to San Francisco takes just an hour and forty-five minutes. Ex. GG (showing 3 hr nonstop flights from San Diego to Houston); Ex. HH (showing 2 hr 51 min driving time from Houston to Waco); Ex. II (showing flights from San Diego to San Francisco). The only reasons he provides for why NDCA is less convenient are that "RRA's attorneys are not in Northern California," and that "[i]n my experience, hotels tend to be more expensive in Northern California than in Texas." *Id.* ¶ 7. Any difference in the cost of the hotels is partially compensated for by the difference in the cost of the flights. Ex. GG (flights to Houston ~$166); Ex. II (flights to San Francisco ~$99). The

location of counsel is irrelevant. *See, e.g., In re Horseshoe Ent.*, 337 F.3d 429, 434 (5th Cir. 2003); *see also In re Google Inc.*, 588 F. App'x 988, 991 (Fed. Cir. 2014).

      5.    <u>RRA Fails to Account for Time Costs</u>

RRA also ignores the time cost of travel. *See In re Google LLC*, No. 2021-171, 2021 WL 4592280, at \*5 (Fed. Cir. Oct. 6, 2021) (finding that time away from home in an important consideration); *In re Google LLC*, No. 2021-170, 2021 WL 4427899, at \*4 (Fed. Cir. Sept. 27, 2021) (same); *In re Volkswagen AG*, 371 F.3d 201 (5th Cir. 2004) ("Additional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment."). The convenience driver in this case is the time cost for witnesses, which is far lower in NDCA given that vast majority of relevant, likely witnesses reside in or closer to NDCA. *Supra* §§ II.A.2-4; Dkt. 45 at 11-13. Any minor differences in *financial* costs are irrelevant and do not change that the factor weighs heavily in favor of transfer.

Regardless, RRA's financial costs analysis is flawed. The Bay Area has several major airports and multiple direct flights from all major cities, including San Diego; Waco does not. Weinstein Dep. at 113:8-25; 125:15–22; 126:5–10. All of Defendants' currently identified witnesses are in California, and the difference between local travel for the NDCA witnesses and a non-stop 90-minute flight from San Diego compared to the hours-long travel to Waco is significant. Dkt. 45-5 at 1 (flights from San Diego to San Jose); Ex. II (flights from San Diego to San Francisco); Weinstein Dep. at 125:15-126:9. Further, RRA's skewed analysis of hotel costs is misleading and does not weigh against transfer. Dkt. 73-2, Ex. 3 (excluding hotels with "airport" in name; only searching some hotel brands; assuming only San Jose-area hotels).

    **B.**    **<u>Availability of Compulsory Process Strongly Favors Transfer</u>**

That RRA will not call certain third party witnesses at trial is irrelevant. RRA does not speak for Defendants. Dkt. 73 at 8. Of course, RRA has no interest in calling prior art inventors, whose testimony would go towards showing invalidity. It is *Defendants* that will call third party prior art witnesses such as Mohindra and Tong Zhang at trial, not RRA.

The Federal Circuit has rejected RRA's rationale that prior art witnesses are "rarely called to trial" (Dkt. 73 at 8 (citing Dkt. 73-2, ¶ 45)), requiring courts to engage in a case-by-case analysis based on specific facts in the record. *In re Hulu, LLC*, No. 2021-00142, 2021 WL 3278194, at *3 (Fed. Cir. Aug. 2, 2021) (granting mandamus instructing district court to transfer case and explaining that the district court "erred by ignoring all of Hulu's proposed prior art witnesses for the reason that 'prior art witnesses are generally unlikely to testify at trial'"). Because multiple Mohindra references are cited on the face of the patent, Mohindra's relevance is heightened for the transfer analysis and RRA and its expert's speculation about whether he will be called at trial is insufficient. *Id.*; Dkt. 1-1 at "References Cited" (citing 6,717,981 B1 and 2003/0165203 A1 to Mohindra). As to Zhang, RRA cited his publications in its infringement contentions, which have not been amended. It cannot now claim that his testimony is not relevant.

Because invalidity is an important defense in this case, Defendants will likely bring prior art witnesses to trial.[11] RRA's and its experts' speculation is of little import. *In re Juniper Networks, Inc.*, 14 F.4th 1313, 1319 (Fed. Cir. 2021). Because there are specifically identified third party witnesses who are only subject to the subpoena power of NDCA, the compulsory process factor weighs in favor of transfer. *See In re Hulu, LLC*, 2021 WL 3278194, at *3.

---

[11] Defendants need not commit to calling Mohindra or Zhang at this time and would not have identified them in the transfer analysis if they were not under consideration. It is enough that Defendants have shown that the potential witness has "relevant and material information at this point in the litigation." *In re Hulu*, 2021 WL 3278194 at *3 (quoting *In re Genentech, Inc.*, 566 F.3d 1338, 1343 (Fed. Cir. 2009)).



This case is not about wafer fabrication or what is on a wafer when it leaves a fab. Cafarella—the sole named inventor and self-alleged drafter of the asserted patent and the sole person behind RRA—confirmed that wafers and wafer fabrication have nothing to do with his patent:

> Q: The '313 patent doesn't claim any method for fabrication of wafers, correct?
>
> . . .
>
> A: I think I can answer that one. It doesn't talk about fabrication at all.
>
> Q And so the '313 patent doesn't claim a method for fabrication of dies, correct?
>
> A Are we on the same planet here? Seriously. There's nothing in this patent – this is a patent about the design of an electronic system. It doesn't talk about how you build the widgets, what you build them out of or what kind of processing line you use. It could be discrete, it could be integrated, but that's not what this patent is about.

Dkt. 73-12 at 77:6–23; *see also* Murias Dep. at 129:15–21.

RRA's theory that

██████████████████████████████████████████████████

████████████████████████████████████████ He admitted,

however, that he did not actually know that Richardson is more than 200 miles from Austin. Murias

Dep. at 125:13-19.

Second, Murias speculates that ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████ Dkt. 73-1, ¶¶ 42–43 (emphasis added). Although Murias admitted during

his deposition that there is actually "no way for [him] to tell" who ███████████████████

██████████████████████████████████████████████████

██████████████████████ Murias Dep. at 123:2–10. Weinstein further

confirmed that his and Murias's statements ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ Weinstein Dep. at 185:8–18. That speculation has no basis in

reality. ██████████████████████████████████████████

██████████████████████████████████████████. Ex. AA at ¶¶ 4-14.

██████████████████████████████████████████████████

█████████████████████████ *Id.* at ¶¶ 5-6, 9, 11-13. ████████████

█████████████████████████████ *Id.* at ¶ 8. ████████████████

███████████████████████ *Id.* at ¶¶ 8, 14. █████████████

██████████████████████████████████████████████████

*Id.* at ¶¶ 15-16. To the extent Murias truly believes that testimony from ████████████ ████████████████████████ that favors transfer because the people who did that work for the accused products are Qualcomm employees outside of Texas (mostly in California). *Id.* at ¶¶ 10, 17-18

Because RRA and its expert's rationale for the relevance and knowledge ████████ ████████████████████████████████████████████████████. *DataQuill, Ltd. v. Apple Inc.*, No. A-13-CA-706-SS, 2014 WL 2722201 (W.D. Tex. June 13, 2014). Like *DataQuill*, this case is not about wafer fabrication ████████████████████████████████ ████████████████████████████████████. 2014 WL 2722201, at *3 ("Although Samsung manufacturers [sic] chips for Apple in Austin, the manufacturing of those chips is not at issue in this case, and Samsung has not been sued."); *see also* Dkt. 74-9 at 17–18; Dkt. 73-5 at 137:8–138:17; Dkt. 71-11 at 16:6-15, 19:11-16, 52:22-53:6; Ex. G at Answers 1-4, 13-14; Ex. H at QCRRAMTT346_0000024; Ex. G. Even then, at most the end product (████████████ ████████████████████████) is tangential to the core dispute regarding I-Q gain calibration. *DataQuill*, 2014 WL 2722201 at *3 n.3 ("However, the controller itself is at best tangential to the core dispute over how the iPhone uses software to interact with remote data sources."). The hardware-related limitations are generically recited and simply facilitate the alleged I-Q gain calibration invention.[12] *See* Dkt. 73-12 at 39:1–13, 67:20–25, 69:9–11, 68:12–24,

---

[12] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

68:25–69:2; 69:3–14, 69:16–19, 69:23–70:7, 70:8–10, 70:11–14, 70:15–71:2, 72:15–24, 72:25–73:2, 73:3–5, 73:6–8 (sole inventor admitting that he did not invent hardware elements, including "[t]ransceivers," "processors," "receive chains," "phase shifters," etc.); *see also DataQuill*, 2014 WL 2722201 at *3 (concluding that "the focus of the infringement story" is how the accused products operate rather than the limitations that simply facilitate that operation—e.g., the "controller," the "memory"). Like the same arguments in *DataQuill*, RRA's arguments regarding ▉▉▉▉▉▉▉▉▉▉▉▉▉ should be rejected. *See also DataQuill*, 2014 WL 2722201 at *3 (evaluating infringement "requires information from Apple's software and hardware engineers in Cupertino, not its third-party processor manufacturer in Austin").

Further, if RRA's allegations regarding the wafers produced ▉▉▉▉▉▉▉▉▉▉



Thus, for multiple reasons, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

Finally, RRA's analysis completely ignores the actual factor at issue here, which is the availability of ***compulsory process***. Instead, RRA discusses the "trial attendance cost." Dkt. 73 at 7-8. RRA's neglect of the true issue makes little sense, as even under RRA's analysis, the average cost of attendance of Mohindra, Zhang, and ▉▉▉▉▉▉▉ in each jurisdiction is comparable. Dkt. 73 at 7 (showing $20 difference). Compulsory process can secure the attendance of two

potential witnesses identified by Defendants in NDCA, but only one potential witness RRA identifies in WDTX. Thus, even if ███████████ becomes a witness (which is unlikely), this factor still favors transfer.[13]

### C.    No Sources of Proof Are in WDTX

As with the location of witnesses, RRA also misrepresents unrebutted evidence confirming the ease of access to sources of proof in NDCA and the lack of relevant evidence repositories in WDTX. RRA raises rhetorical questions regarding the location of relevant Qualcomm technical and financial information, but the locations were identified in both a thorough interrogatory response and in the sworn declarations submitted with the opening brief. Dkt. 74-6 at 12–14; Dkt. 45-15 ¶ 23; Dkt. 45-16 ¶ 21. Contrary to RRA's false assertions, ████████████ ████████████████████████████████████████████████. Dkt. 74-6 (Qualcomm's Suppl. Resp. to Rog. 4) at 12–14 ("██████████████████████ ███████████████████████"), 12–13 (████████████████████ █████████████████████████████████████). Murias has already analyzed infringement based entirely on source code and schematics ██████████. *See, e.g.*, Murias Dep. at 37:15–39:10. RRA identifies no other Qualcomm information—let alone information in Texas—that it needs. RRA's remaining speculation that there might be relevant documents in WDTX is predicated on its demonstrably false allegations regarding WDTX witnesses and fail for the same reasons. *See* § II.A.2.b, *supra*. That failure is compounded by the evidence demonstrating that there are ██████████████████ and the fact that

---

[13] RRA asserts that Defendants have not indicated that they would be inconvenienced by presenting Mohindra or Zhang by deposition designation. RRA has likewise not asserted that it would be inconvenienced by presenting ██████████ deposition designation.

██████████████████████ houses no relevant documentation. Dkt. 74-6 at 12-14; Ex. AA ¶¶ 4-18;
*see* § II.B, *supra*.

Technical documents ████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
Dkt. 45-17 ¶ 7; Dkt. 74-3 at 13-16 (Resp. to ROG 4). The relevant non-technical documents
████████████████████████████████████████████████████████ Dkt. 45-17 ¶ 11;
Dkt. 74-3 at 13-16 (Resp. to ROG 4). For the same reasons that the employees identified by Murias
and Weinstein are not relevant witnesses, they do not generate relevant documents in Texas.
Although RRA argues that ██████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
██████████████████████ Because no relevant documents are created or stored in Texas, Apple
will produce nothing from Texas.

RRA alleges that Rollins's statement that there are no "unique working files or documents
relevant to this case located in the WDTX" is an "implicit admission" that Apple has such
documents. Dkt. 73 at 6. Not so. It is unreasonable to expect Apple to search its entire Texas
facilities to see if anyone there happens to have a copy of a document relevant to this lawsuit.
Rollins's statement merely reflects the reality that such a search would be impossible in the time
constraints of venue discovery for this case, and his care to swear to no more than he is certain
of.[14]

---

[14] RRA also alleges that there is something sinister about Rollins's inability to describe the entire
contents of Apple servers in NDCA. Opp. at 6. But, again, it is unreasonable for Apple to inventory
the entire contents of all its servers for the purposes of venue discovery in this case. It is enough
that none is located in Texas.

RRA's own evidence does not weigh against transfer. Documents housed at counsel's office are a proxy for choice of counsel—a consideration that has been resoundingly rejected in the transfer analysis. *See, e.g., Horseshoe*, 337 F.3d at 434; *see also Google*, 588 F. App'x at 991. Further, RRA's main attorneys (and the server its documents came from[15]) are not even in WDTX—they are in SDTX and EDTX.

In any event, the location of Defendants' documents is more important. *In re Nintendo Co.*, 589 F.3d 1194, 1199 (Fed. Cir. 2009) ("[I]n patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location."). The burden on RRA to produce documents that have already been collected in a prior suit and are stored in a single repository already accessible to counsel is far less than the burden on Defendants to collect and produce documents from disparate sources in the first instance.

## III.    THE PUBLIC INTEREST FACTORS FAVOR TRANSFER

### A.    NDCA Has a Greater Local Interest in the Suit

The locus of investment and activity in the accused technology is in NDCA. NDCA is home to Apple and its relevant witnesses *and* the relevant Qualcomm ███████████

███████████████████████████████████████████████████

███████████████████████████████████████

As demonstrated above, none of the specific employees or generically identified groups in Texas are likely witnesses in this case. At best, RRA demonstrates only general corporate presence

---

[15] RRA contends that all "47,985 pages" of documents they produced came from Texas "where they have resided for several years." Dkt. 73 at 4. That is erroneous. The 47,985 pages of documents counsel cites includes (1) exports of public information from sites like LexMachina and LinkedIn, pulled by counsel in December 2021, (2) slip sheets saying only "Privileged Document," and (3) attorney-created (litigation-related) documents.

in Texas that is not tied to the accused technology and products at the center of this case. *In re Apple Inc.*, 979 F.3d 1332, 1345 (Fed. Cir. 2020) ("This factor most notably regards not merely the parties' significant connections to each forum writ large, but rather the significant connections between a particular venue and the events that gave rise to a suit." (internal quotation marks omitted)).

The third-party ████████ does not sway the outcome. This case has nothing to do with wafer fabrication and ████████████████████████████████████████. Section II.B, *supra*. Accordingly, a wafer fabrication site cannot constitute a significant connection between the venue and the events that give rise to the suit. *See DataQuill*, 2014 WL 2722201 at *3 ("the manufacturing of those chips is not at issue in this case"); *Juniper Networks,* 14 F.4th at 1320 (A "general presence in the Western District of Texas is not enough to establish a local interest in that district comparable to that of the Northern District of California" where events forming the basis for infringement allegations occurred). Further, RRA misrepresents ████████████████████ ████████████████████ *See* n.12, *supra*. And given that ████████████████████ ████████████████████████████████████████████████████████ ████████████████████ creates no other significant connection between the District and the events that give rise to this suit. *See In re Google LLC,* 855 F. App'x 767, 768 (Fed. Cir. 2021) ("Google's mere presence in the Western District of Texas insofar as it is not tethered to the events underlying the litigation is not entitled to weight in analyzing the local interest factor in this case."); *DataQuill*, 2014 WL 2722201 at *3 ("the manufacturing of those chips is not at issue in this case").

Accordingly, the local interest factor weighs heavily in favor of the transferee forum.

### B.    The Court Congestion Factor Is Neutral

RRA's cherry-picked time-to-trial data does not move the needle. The Federal Circuit has repeated that "the Western District of Texas and the Northern District of California show no

significant differences in caseload or time-to-trial statistics." *Juniper Networks*, 14 F.4th at 1322; *Apple Inc.*, 979 F.3d at 1343 ("NDCA and WDTX have historically had comparable times to trial for civil cases"). RRA ignores the Federal Circuit's key holding and attempts to muddy the analysis by omitting certain types of patent cases and failing to account for the fact that NDCA has 17 Article III judges compared to Waco's one, and therefore can handle a much higher volume of trials for the foreseeable future. Dkt. 45 at 13–14; Dkt. 45-12 (WDTX and NDCA time-to-trial statistics). Nevertheless, the parties still agree that the difference in the time-to-trial is only 6-8 months, which is not significant. Dkt. 45 at 13 (NDCA is 6.6 months faster); Dkt. 73-2 ¶ 95-97 (WDTX is 8 months faster).[16]

Weinstein's speculation regarding "opportunity costs" of transferring the case to NDCA fails for several reasons. First, RRA caused over 7.5 months of its own delay. RRA waited to file suit for five months after the first announcements that accused products were on sale (*see* Ex. I) and then extended transfer discovery, the Markman hearing, and ultimately the trial for another 2.5 months. RRA cannot now credibly claim that an alleged few month delay will cause it harm.

Further, Weinstein's alleged losses to RRA as a result of the delay are irrelevant to this factor and not based on any reliable data. RRA and its expert cite no actual investment or other financial harm to RRA or even any past investment activity to give some credibility to the allegation. Dkt. 73 at 14–15. Weinstein uses a royalty rate allegedly from a prior case against Samsung but admitted that (1) he did not use the actual rate resulting from the Samsung case (Weinstein Dep. at 129:9–14; Ex. J (Sealed Order, *Red Rock Analytics, LLC v. Samsung Elecs.*

---

[16] RRA includes a time-to-trial calculation made by its attorney Harris using a longer timeframe than its expert but does not appear to rely on Harris's calculations, instead relying on its expert's narrow dataset. *See* Dkt. 73 at 14-15. Taking Harris's calculations as true indicates that the difference in time to trial between NDCA and WDTX is shrinking with time.

*Co. Ltd.*, No:2:17-cv-00101-RSP, Dkt. 282 (E.D. Tex. Apr. 17, 2019)) and (2) he made no effort to evaluate whether that rate would apply in this case (Weinstein Dep. at 127:25-128:12, 148:14-149:2, 155:18-22, 157:23-158:2; 162:8-163:8). The rate is therefore wrong as a matter of law, rendering Weinstein's conclusions improper. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp.*, LLC, 879 F.3d 1332, 1350 (Fed. Cir. 2018) ("When performing a *Georgia–Pacific* analysis, damages experts must not only analyze the applicable factors, but also carefully tie those factors to the proposed royalty rate."). Compounding the problems with the calculation, the sole support for Weinstein's loss assumptions ($1 million for every $10 million in damages) is his own paper, which is hardly reliable. Weinstein's assertion that it would cost $10 million more for the parties to litigate in NDCA than WDTX is based on an incorrect reading of an AIPLA 2021 survey. Dkt. 73-2, ¶ 107. AIPLA surveyed fees based on the "location of survey respondent," not the court in which a given case was pending. Dkt. 73-2, Ex. 11. Finally, RRA and its experts' opportunity costs argument is wedged under the "court congestion" *public* factor, but the alleged losses are only to Florida-based RRA. Dkt. 73 at 14–15.[17]

Because the time-to-trial differences are not significant, this factor is neutral. Regardless, it cannot outweigh the most important witness convenience factor, which strongly favors transfer. *In re Genentech, Inc.*, 566 F.3d 1338, 1343 (Fed. Cir. 2009) (noting importance of the convenience of witnesses factor); *Auto-Dril, Inc. v. Nat'l Oilwell Varco, L.P.*, No. 6:15-cv-00091, 2016 WL 6909479, at *7 (W.D. Tex. Jan. 28, 2016); *see* Section II.A, *supra*; Dkt. 45 at 6–7, 11–13.

## IV.    CONCLUSION

---

[17] Recognizing the lack of analysis to the public interest factor, Weinstein tried to backtrack to argue that the cost is "to society," but that is not what RRA's Response contends. Dkt. 73 at 14–15. Also, Weinstein was unable to articulate how RRA's theoretical investment losses impact the undefined "society." Weinstein Dep. at 246:8–248:18.

Because the convenience of witnesses, compulsory process, ease of access to proof, and local interest factors weigh heavily in favor of transfer, the remaining factors are neutral, and RRA and its experts' arguments and opinions are contrary to the record and rely on unfounded conjecture, this case should be transferred to NDCA.

Dated: March 4, 2022

Respectfully submitted,

/s/ J. Stephen Ravel

/s/ Sarah Guske

Mark D. Selwyn (*Pro Hac Vice*)
Joseph F. Haag (*Pro Hac Vice*)
S. Dennis Wang (*Pro Hac Vice*)
Anh-Khoa Tran (*Pro Hac Vice*)
Henry M. Nikogosyan (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
  and DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, California 94306
Tel: (650) 858-6000
Email: mark.selwyn@wilmerhale.com
Email: joseph.haag@wilmerhale.com
Email: dennis.wang@wilmerhale.com
Email: khoa.tran@wilmerhale.com
Email: henry.nikogosyan@wilmerhale.com

Joseph J. Mueller (*Pro Hac Vice*)
Monica Grewal (*Pro Hac Vice*)
Annaleigh E. Curtis (*Pro Hac Vice*)
Madeleine C. Laupheimer (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
  and DORR LLP
60 State Street
B//oston, Massachusetts 02109
Tel: (617) 526-6000
Email: joseph.mueller@wilmerhale.com
Email: monica.grewal@wilmerhale.com
Email: annaleigh.curtis@wilmerhale.com
Email: madeleine.laupheimer@wilmerhale.com

J. Stephen Ravel
Texas State Bar No. 16584975
Kelly Ransom
Texas State Bar No. 24109427
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
Tel: (512) 495-6429

Douglas M. Kubehl
BAKER BOTTS LLP
2001 Ross Avenue
Dallas, TX 75201
Tel: (214) 661-4486
Email: doug.kubehl@bakerbotts.com

Aashish G. Kapadia
Nick Schuneman
BAKER BOTTS LLP
98 San Jacinto Blvd., Suite 1500
Austin, TX 78701
Tel: (512) 322-2500
Email: Aashish.kapadia@bakerbotts.com
Email: nick.schuneman@bakerbotts.com

Sarah Guske (*Pro Hac Vice*)
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, CA 94111
Tel: (415) 291-6200
Email: sarah.guske@bakerbotts.com

*Attorneys for Qualcomm Inc.*

Email: steve.ravel@kellyhart.com
Email: kelly.ransom@kellyhart.com


*Attorneys for Apple Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record are being served with a copy of the foregoing document via electronic mail on March 4, 2022.

_/s/ J. Stephen Ravel_____
J. Stephen Ravel